IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| PATRICK VAN ANDERSON, | ) | Case No. 4:11cv00050 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| LIFE INSURANCE COMPANY | ) | |
| OF NORTH AMERICA, | ) | |
| | ) | By: Jackson L. Kiser |
| Defendant. | ) | Senior United States District Judge |

Before me are Defendant's Motion for Judgment and Plaintiff's Motion for Judgment. On March 27, 2012, I held a hearing on these motions, at which counsel for both Plaintiff and Defendant appeared and presented oral argument. Having thoroughly reviewed the briefs, the record, and the arguments of counsel, the matter is now ripe for decision. After careful consideration, and for the reasons set forth below, Defendant's Motion for Judgment is **GRANTED**, and Plaintiff's Motion for Judgment is **DENIED**.

I.   **STATEMENT OF FACTS AND PROCEDURAL HISTORY**

This case arises out of Plaintiff Patrick Van Anderson's ("Plaintiff") claim for proceeds under a life insurance policy maintained by his mother pursuant an employee welfare benefit plan. Accordingly, the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA") govern this case. The relevant facts are largely undisputed. Prior to her death, Plaintiff's mother, Rachel Anderson ("Rachel"), was employed at Danville Regional Medical Center. (Def.'s Mot. for J. pg. 3 [ECF No. 19]); Pl.'s Mot. for J. pg. 2 [ECF No. 22].) As such, she and her husband, Gary Anderson ("Gary"), were eligible to apply for life insurance coverage

1

under a policy issued by Defendant Life Insurance Company of North America ("LINA") as part of an employee welfare benefit plan. (Def.'s Mot. for J. pg. 3; Pl.'s Mot for J. pg. 2–3.) The policy made available two different types of coverage to Rachel and her spouse—basic guaranteed-issue life insurance, and voluntary supplemental life insurance. (Def.'s Mot. for J. Ex. 1, pg. 368, 371.) Prior to her death, Rachel applied for and received basic guaranteed-issue coverage in the amount of 1x her annual compensation of $50,000.00, and voluntary supplemental coverage in the amount of $100,000.00. (*Id.* Ex. 2, pg. 17.) She listed Gary, David E. Garret, Jr. ("Garrett"), her son by a previous marriage, and Kendra Singleton and Adien Garrett, her grandchildren, as her beneficiaries. (*Id.* Ex. 3, pg. 16.) At the time of his death, Gary had two levels of voluntary coverage in effect in the amount of $50,000.00 each. (*Id.* Ex. 1, pg. 371 & Ex. 2, pg. 17.) One level was a guaranteed-issue in the amount of $50,000.00, and the other level was an additional non-guaranteed issue in the amount of $50,000.00 that required proof of insurability. (*Id.* Ex. 1, pg. 371, 374.) Gary did not designate any beneficiaries for this coverage; therefore, under the policy, the benefits were payable "to the first surviving class of the following relatives: spouse; child or children . . . ." (*Id.* Ex. 1, pg. 50.) This case concerns the $50,000.00 in non-guaranteed issue coverage that Gary had in effect at his death.

Rachel and Gary applied for this additional $50,000.00 in non-guaranteed coverage for Gary—available to the employee's spouse under the policy—on November 10, 2008. (*Id.* Ex. 4, pg. 1–2.) To prove insurability, Gary had to answer a series of health-related questions. The form expressly stated that no coverage would be effective unless the applicant met the underwriting requirements on the effective date of the coverage. (*Id.* pg. 2.) Gary indicated on the form that he had not been diagnosed with any of the conditions listed in Section A, nor been

2

told by any medical professional that he had any of the conditions listed in that section.[1]  (*Id.* pg.

1.)  He also indicated that he had not engaged in any of the activities listed in Section B.[2]  (*Id.*)

---

[1] Section A reads as follows:

Within the last 5 years has the proposed insured been:
- diagnosed with any of the conditions shown in items A through J below.
- told by a medical professional he/she has or may have any of the conditions shown in items A through J below.
- or been treated by a medical professional for any of the conditions shown in items A through J below?

A. High blood pressure, heart attack, chest pain or Angina, a heart murmur, poor circulation or any other condition affecting the heart or circulatory system?

B. Diabetes, glandular condition, Hepatitis, or any condition affecting the esophagus, stomach, intestines, liver or pancreas?

C. Asthma, Chronic Bronchitis, Emphysema, or any other condition affecting the lungs or respiratory tract?

D. Any condition affecting the kidneys, urinary tract, prostate gland or reproductive system?

E. HIV infection, AIDS, or any other condition affecting the immune system or lymph nodes?

F. Stroke, Transient Ischemic Attack (TIA), Alzheimer's disease, paralysis, Epilepsy, fainting, seizures, headaches, or other condition affecting the nervous system?

G. Anemia or any other condition affecting the blood, Lupus, Arthritis, deformity or loss of limb?

H. Anxiety, Depression, Bipolar Disorder, or any other mental disorder or condition?

I. Cancer, Tumor, Leukemia, Hodgkin's Disease, Polyps or Mole?

J. Alcohol or drug abuse or dependency?

(Def.'s Mot. for J. Ex. 4, pg. 1.)  A "No" response was indicated for each of these questions under the column designated "Spouse."  (*Id.*)

[2] Section B reads as follows:

Within the last 5 years has the proposed insured:

A. Had a Driving While Intoxicated (DWI), Driving Under the Influence (DUI) or Operating Under the Influence (OUI) conviction?

B. Smoked cigarettes:
   1.    For how many years has the proposed insured smoked?

3

Based on Gary's representations on the application form, LINA issued to Gary the additional $50,000.00 in voluntary spousal coverage, effective January 1, 2009. (Def.'s Mot. for J. pg. 5.)

On May 9, 2009, both Rachel and Gary were killed simultaneously in a motorcycle accident. (*Id.*) Their respective beneficiaries made claims for benefits under the insurance coverage issued to each. (*Id.*) Plaintiff and his brother, Derek Anderson ("Derek"), made claims under the coverage issued to Gary. (*Id.*) David Garrett, Jr. ("Garrett"), as personal representative of Rachel's estate, claimed not only the benefits under Rachel's coverage, but also asserted a claim on behalf of her estate for the benefits under Gary's coverage. (*Id.* pg. 6.) Garrett argued that Gary was responsible for Rachel's death and that, therefore, Virginia's slayer statute barred his heirs from receiving any benefits. (*Id.* [citing Va. Code Ann. § 55-401 *et seq.*].) On August 24, 2009, LINA made an initial determination as to these competing claims. It denied Garrett's claim to the benefits from Gary's coverage and sent Plaintiff and Derek claim

---

> 2. Approximately how many cigarettes are, or were, smoked on average per day?
> 3. If cigarette smoking has been discontinued, when (month and year) did the proposed insured quit smoking?
> C. Used any controlled or illegal drug or other substance?
> D. Been seen for, or been advised to have sought treatment for, observation and/or consultation for surgery, medical examination, and/or tests, such as blood, urine, X-rays, electrocardiograms, scans, biopsies, or any medical tests/exams not listed here or above, other than normal routine physical exams?
> E. Used any medication proscribed by a physician or other medical practitioner, or used any form of alternative and complimentary medical treatment or remedy, including herbs or acupuncture?
> F. Been seen, sought treatment for, consulted, consulted, advised they had and/or received any medical advice from a health care practitioner for any disease, disorder and/or medical impairment not listed above.

(Def.'s Mot. for J. Ex. 4, pg. 1.) A "No" response was indicated for each of these questions under the column designated "Spouse." (*Id.*)

4

forms to allow them to file their claims for those benefits.  (*Id.* Ex. 5, pg. 276–78 & Ex. 6, pg. 100–101 & Ex. 7, pg. 81.)  Plaintiff was a minor at the time of LINA's determination as to the competing claims; therefore, LINA could not pay the proceeds directly to him.  (*Id.* pg. 6.)  Accordingly, his guardian, Ellen McCormick, filed a claim for the benefits on his behalf and, in the claim form, agreed to place the proceeds, once released by LINA, into a CIGNAAssurance® account[3] until Plaintiff attained the age of majority several months later.  (*Id.* Ex. 7 & 8, pg. 288.)

Subsequently, on August 31, 2009, Garrett retained counsel to appeal LINA's decision denying Rachel's heirs the proceeds of Gary's coverage under Virginia's slayer statute.  (*Id.* Ex. 9, pg. 262 & Ex. 10, pg. 262.)  Garrett submitted additional information and documents in support of his appeal.  Based on these submissions, LINA further investigated Gary's medical history.  As a result of Garrett's appeal, LINA delayed releasing any benefits to Plaintiff and informed him of this status by letter dated March 24, 2010.  (*Id.* Ex. 11, pg. 234.)  LINA denied Garrett's appeal on May 5, 2010.  (*Id.* Ex. 12, pg. 206–09.)  By letter dated May 6, 2010, LINA informed Plaintiff: "I have approved your claim for Group Term Life Insurance for $25,629.35." (*Id.* Ex. 13, pg. 193.)  It further informed Plaintiff that it had placed the proceeds into his CIGNAAssurance® account and that he could keep the funds there as long as he wished.  (*Id.*)  This letter concerned only the benefits payable under Gary's guaranteed supplemental coverage.  On the same day, LINA sent a letter to Plaintiff's counsel informing him "that the remaining benefit under the Dependent Group Term Life insurance claim for Gary V. Anderson is still being reviewed."  (*Id.* Ex. 14, pg. 191.)  It stated that it was withholding payment of the

---

[3] The claim form describes the CIGNAAssurance® account as "an interest-bearing account" that provides "a safe, secure place to keep your proceeds while you decide how best to use them." (Def.'s Mot. for J. Ex. 8, pg. 287.)  The claim form states that the insurer will automatically open such an account for the beneficiary when the benefit is $5,000.00 or more.  (*Id.*)  The beneficiary has the power to take part or all of the money out of the account by writing a draft.  (*Id.*)

5

additional $25,000.00 in benefits under the non-guaranteed issue pending further investigation into the truthfulness of Gary's responses in the application. (*Id.*) Subsequently, LINA proceeded with its investigation into Gary's medical history.

Through its investigation, LINA discovered that the answers on Gary's application for the non-guaranteed coverage were not truthful. Gary's medical records from Halifax Regional Hospital in South Boston, Virginia, show that he underwent medical testing on February 26, March 19, March 20, March 27, and June 6, 2008. (*Id.* Ex. 15, 16, 17, 18 & 19.) The battery of tests that Gary underwent included X-rays, blood tests, urinalyses, ultrasounds, and CT scans. (*Id.*) Medical records dated February 26, 2008, indicate that Gary had a "[h]istory of alcohol abuse." (*Id.* Ex. 15, pg. 459.) They further indicate that lab results showed "a patient with acute pancreatitis" and state that the "likely etiology of pancreatitis is alcohol abuse." (*Id.* Ex. 15, pg. 460.) The records also note a "[h]istory of gastroesophageal reflux and heartburn for approximately the last two years." (*Id.* Ex. 15, pg. 459.) Medical records dated December 8, 2008, indicate that Gary had a "history of restless leg syndrome, anxiety, reflux disease, [and] history of alcoholic pancreatitis presenting with abdominal pain." (*Id.* Ex. 20, pg. 427.) As of December 12, 2008, his discharge diagnoses were "[a]cute on overlying chronic pancreatitis, alcohol abuse with alcohol withdrawal, insomnia, [and] gastroesophageal reflux disease." (*Id.* pg. 422.) On August 14, 2008, a physician at Southern Medical Associations saw Gary for "pancreatic pseudocysts." (*Id.* Ex. 21.) These notes also reflect that Gary was taking Ativan for anxiety at the time. (*Id.*) Gary failed to disclose any of these ongoing health problems when he and Rachel applied for the additional, non-guaranteed coverage on November 10, 2008.

Based on these revelations, LINA rescinded the coverage in excess of the $50,000.00 guaranteed coverage. (*Id.* Ex. 22, pg. 134–37.) By letter dated July 20, 2010, LINA informed

Plaintiff's counsel that the $25,000.00 in proceeds would not be released for payment. *Id.* It made clear that, had Gary answered the questions in the application truthfully, it would not have approved the additional coverage. (*Id.* pg. 136.) On September 10, 2010, Plaintiff's counsel appealed LINA's decision to withhold the proceeds. (*Id.* Ex. 24.) Plaintiff's letter of appeal stated: "We recognize that it does not appear that Patrick's father gave a complete history in regard to his pancreas and other health issues. . . . However, what is abundantly clear is that none of his health problems had anything to do with the blunt force trauma that caused his death." (*Id.* pg. 105.) Furthermore, Plaintiff argued that, having placed the proceeds into an account for his benefit as of August 24, 2009, LINA could not under the terms of the policy subsequently deny his claim more than a year later.[4] (*Id.* pg. 104–05.) By letter dated February 11, 2011, LINA informed Plaintiff that his appeal was rejected. (*Id.* Ex. 25.)

Plaintiff filed the Complaint in the instant case on November 11, 2011. (Comp. [ECF No. 1].) The Complaint alleges that, under the policy, LINA had to make any decisions regarding payment of the proceeds within ninety days of receiving a claim. (*Id.* ¶ 16.) The policy did not give LINA the ability to reconsider or change its decision as to the payment of proceeds more than one year after Plaintiff made the claim and LINA paid the amount into an account for his benefit. (*Id.* ¶ 17.) Plaintiff claims that LINA's failure to pay him the proceeds deposited for his benefit constituted breach of contract. (*Id.* ¶ 21–24.) The Complaint, therefore, seeks damages in the amount of $25,000.00. In its Answer, LINA asserts that all of Plaintiff's claims are preempted by ERISA and that it discharged its duties under the policy in accordance with the governing documents and the provisions of ERISA. (Ans. ¶ 26, 27, 34 [ECF No. 8].)

---

[4] It is unclear from Plaintiff's letter of appeal whether he believed at this point in time that LINA had deposited the relevant funds into his CIGNAAssurance® account. As explained *infra*, the record reveals that LINA never did so.

On February 6, 2012, LINA filed its Motion for Judgment in which it argues that it properly denied payment of benefits to Plaintiff. (Def.'s Mot. for J. [CMF No. 19].) LINA argues that, under the terms of the claim form filed by McCormick on Plaintiff's behalf, it was authorized to recover amounts incorrectly paid from the CIGNAAssurance® account established for Plaintiff. (*Id.* pg. 10.) It asserts that the document establishing that account expressly reserves the right to "'reduce account balances for any payment made in error.'"[5] (*Id.* [quoting Ex. 8, pg. 288].) Moreover, ERISA recognizes the right of plan fiduciaries to obtain equitable relief, including rescission of the policy and recovery for proceeds paid erroneously. (*Id.*) Because Gary should not have received coverage as a result of the misrepresentations in his application, LINA properly rescinded the policy and reclaimed the funds paid into the account. (*Id.* pg. 10–11.)

Subsequently, on February 24, 2012, Plaintiff filed his Motion for Judgment. (Pl.'s Mot. for J. [ECF No. 22].) Plaintiff argues that LINA can adduce no evidence that Gary himself actually answered the questions on the application for additional coverage. (*Id.* pg. 4, 7, 9–10.) The questions and instructions in the application were directed toward a single individual—the employee. (*Id.* pg. 3–4, 7.) Rachel, therefore, apparently provided information about Gary's health and medical history to the best of her own knowledge. (*Id.* pg. 4.) LINA has no evidence that Gary himself made any misrepresentations. As such, it had no basis to rescind the policy. Furthermore, Plaintiff maintains that LINA did not retain discretion to reclaim proceeds having paid them into an account for Plaintiff's benefit over a year prior. (*Id.* pg. 5–6, 8.)

---

[5] Here, again, LINA appears to assume that it in fact deposited the relevant proceeds into Plaintiff's CIGNAAssurance® account. The relevance of this provision in the claim form is not otherwise apparent. As explained *infra*, this assumption is incorrect.

## II.   STANDARD OF REVIEW

Plaintiff and LINA agree that the Employee Retirement Income Security Act of 1974 ("ERISA") governs this case.  (Def.'s Mot. for J.pg. 1–2; Pl.'s Mot. for J. pg. 1–2.)  As a general rule, an employee welfare benefit plan governed by ERISA is a contractual document interpreted by courts as any contract under a *de novo* standard of review.  *Booth v. Wal-Mart Stores, Inc.*, 201 F.3d 335, 340–41 (4th Cir. 2000) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109–113 (1989)).  Where, by its terms, a plan confers discretion on an administrator and the administrator acts within the scope of his discretion, however, courts review his actions under an abuse of discretion standard of review.[6]  *Id.* (citing *Firestone*, 489 U.S. at 111).  In the present case, the plan document provides: "The Plan administrator has appointed the Insurance Company as the named fiduciary for deciding claims for benefits under the Plan, and for deciding any appeals of denied claims."  (Def.'s Mot. for J. Ex. 1, pg. 392.)  The plan, therefore, confers discretionary authority to decide claims for benefits on LINA, as the appointed fiduciary.  Plaintiff and LINA appear to agree that the abuse of discretion standard applies.  (Def.'s Mot. for J. pg. 2; Pl.'s Mot. for J. pg. 1.)  Accordingly, the appropriate standard of review in the present case is abuse of discretion.

---

[6] As the Fourth Circuit has recognized:

> The abuse of discretion standard in ERISA cases protects important values: the plan administrator's greater experience and familiarity with plan terms and provisions; the enhanced prospects of achieving consistent application of those terms and provisions that results; the desire of those who establish ERISA plans to preserve at least some role in their administration; and the importance of ensuring that funds which are not unlimited go to those whom, according to the terms of the plan, are truly deserving.

*Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 323 (4th Cir. 2008) (citations omitted).

"Under the deferential abuse of discretion standard, a court will not disturb the administrator's decision as long as it is objectively reasonable, even if the court would have reached a different conclusion." *Winebarger v. Liberty Life Assurance Co. of Boston*, 571 F. Supp. 2d 719, 722 (W.D. Va. 2008) (citing *Doe v. Group Hospitalization & Med. Servs.*, 3 F.3d 80, 85 (4th Cir. 1993)). "An administrator's decision will be considered reasonable if it is 'the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" *Winebarger*, 571, F. Supp. 2d at 722 (quoting *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997)). "'Substantial evidence' in support of a plan decision is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' being 'more than a mere scintilla', but 'less than the weight of the evidence.'" *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). In considering the reasonableness of the administrator's decision, the court should also consider "the adequacy of the materials considered to make the decision and the degree to which they support it." *Booth*, 201 F.3d at 342 (internal quotations omitted). Furthermore, the administrator's decision must "reflect careful attention to 'the language of the plan,' as well as the requirements of ERISA itself." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 323 (4th Cir. 2008) (quoting *Booth*, 201 F.3d at 342). "On the whole," therefore, courts "require ERISA administrators' decisions to adhere both to the text of ERISA and the plan to which they have contracted; to rest on good evidence and sound reasoning; and to result from a fair searching process." *Id.* 322–23. In determining the reasonableness of a fiduciary's discretionary decision, a Court may consider such factors as:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and

> with earlier interpretations of the plan; (5) whether the decision making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth*, 201 F.3d at 342–43. If LINA's decision can be deemed objectively reasonable according to the above criteria, then the court should uphold that determination.

## III.  DISCUSSION

The motions before the Court appear to present two distinct issues. First, applying the abuse of discretion standard as set forth above, I must determine whether LINA's finding that Gary misrepresented his health and medical history in his application for non-guaranteed coverage was objectively reasonable. Second, I must determine whether, as a result of the misrepresentations made by Gary, LINA had the right to rescind the coverage issued to Gary and refuse to pay benefits to the Plaintiff.

### A.  LINA'S Determination that Gary Made Misrepresentations in His Application

The record demonstrates that LINA's determination that Gary misrepresented facts regarding his health and medical history was objectively reasonable. As set forth above, a fiduciary's determination will be deemed reasonable where "it is 'the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" *Winebarger*, 571, F. Supp. 2d at 722 (quoting *Brogan*, 105 F.3d at 161). The evidence adduced by LINA more than satisfies this standard. Gary answered "No" to all of the health questions contained in Sections A and B on the first page of the application form. (Def. Mot. for. J. Ex. 4, pg. 2.) In so doing, Gary represented that he had not been diagnosed with or treated for "[a]ny condition affecting the . . . stomach . . . or pancreas," "[a]nxiety . . . or any other mental disorder or condition," or "[a]lcohol or drug abuse dependency." (*Id.*) Furthermore, he represented that he

11

had not "[b]een seen for, or been advised to have sought treatment for, observation and/or consultation for surgery, medical examination, and/or tests, such as blood, urine, X-rays, electrocardiograms, scans, biopsies, or any medical tests/exams not listed here or above, other than routine physical exams." (*Id.*) The application form confirms on behalf of the applicant: "To the best of my knowledge and belief all written, telephonic, and electronic info I gave is true and complete." (*Id.* pg. 2.) It further states:

> The conditions for the requested insurance to be effective are described in the policy and certificate. . . . I understand and agree that: (1) This request will be a part of the policy that provides the insurance . . . [and] (5) Requested insurance will not be effective for a person if the person does not meet the underwriting requirements on the date insurance is to be effective.

(*Id.*) The legible signature "Gary Anderson" appears above the signature line for "Spouse's Signature (If applying for insurance for your spouse)" on the second page of the application. (*Id.*) The signature is dated "11-10-2008." (*Id.*) Several of these statements were plainly untrue.

Gary's medical records from Halifax Regional Hospital reveal that, as of February 26, 2008, he was diagnosed with "acute pancreatitis." (*Id.* Ex. 15, pg. 459.) Such a condition would certainly fit within the application's plain language of "any condition affecting the . . . pancreas." The records also reveal that, at the time he signed the application, Gary had a consistent history of "gastroesophageal reflux disease." (*Id.* Ex. 15, pg. 459 & Ex. 20.) Such a condition fits within the scope of "any condition affecting the esophagus, [or] stomach." Records from Southern Medical Associations dated August 14, 2008, indicate that Gary was taking Ativan for anxiety at the time. (*Id.* Ex. 21.) Medical records dated December 8, 2008 also indicate a "history of . . . anxiety." (*Id.* Ex. 20, pg. 427.) Records dated February 26, March 19, March 20, March 27, and June 6, 2008, show that, at the time he signed the application, Gary had recently submitted to a battery of tests, including: X-rays, blood tests, urinalyses, ultrasounds, and CT

12

scans. (*Id.* Ex. 15, 16, 17, 18 & 19.) All of these diagnoses and tests occurred well "[w]ithin the last 5 years" prior to signing, as specified in the application language. Plaintiff has submitted no evidence that would cast doubt on the accuracy or authenticity of these medical records. Accordingly, the medical records establish by substantial evidence that Gary misrepresented facts in his application for additional non-guaranteed coverage.

Plaintiff devotes most of his brief and oral argument to the position that the application affords no proof of any misrepresentation on Gary's part. Plaintiff argues that the application "was directed to a single individual providing all of the information and . . . there is nothing to indicate that it was not filled out by a single individual. More importantly, there is no evidence to suggest that Gary Anderson provided any of the information that was incorporated into the application." (Pl.'s Mot. for J. pg. 7.) He submits that the application language was directed to the employee—in this case, Rachel. (*Id.* pg. 4, 9.) It is more likely that Rachel filled out the application for Gary based on her knowledge of his health and medical history. (*Id.*) Plaintiff argues, therefore, that Gary did not actually misrepresent any fact and LINA can adduce no substantial evidence showing that he did. In support of this argument, he submits an affidavit from a forensic document examiner that was not before the plan administrator during the review process. These arguments are unpersuasive.

As an initial matter, when reviewing an administrator's decision under the abuse of discretion standard, the Court is limited to the facts and evidence before the administrator at the time of the decision. *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 789, 790 (4th Cir. 1995); *Sheppard & Enoch Pratt Hospital, Inc. v. Travelers Ins. Co.*, 32 F.3d 120, 125 (4th Cir. 1994). Plaintiff never raised this line of argument during the administrative review process. In his letter appealing LINA's decision, Plaintiff's counsel conceded: "We recognize that it does not appear

13

that Patrick's father gave a complete history in regard to his pancreas and to other health issues that he had had in the past." (Def.'s Mot. for J. Ex. 24, pg. 105.) Plaintiff's primary ground for appeal was that, under the policy, LINA "has 90 days from the date it received a claim to determine whether or not benefits are payable," and LINA denied Plaintiff's claim well after this period. (*Id.*) LINA's letter denying Plaintiff's appeal and upholding the denial of benefits states that it based its decision on "the Policy language and all the documents contained in the claim file, viewed as a whole, including the following specific information:" "Application for increasing Life Insurance form," "Medical Records from Halifax Regional Hospital," and "Your letter of appeal received in our office September 13, 2010." (*Id.* Ex. 25, pg. 83.) It is clear, therefore, that Plaintiff's proffered evidence and argument that Gary did not answer the questions on the form were not before the administrator when it made its decision. Plaintiff cannot now advance this new line of attack in this Court for the first time.

Furthermore, even if this Court were able to consider Plaintiff's new line of argument, his argument is unpersuasive. Plaintiff essentially argues that LINA can adduce no evidence that Gary actually marked the "No" responses to the health questions on the application form. He argues that the language of the form singularly addresses the employee, not the spouse, and that, therefore, it is more likely that Rachel marked the boxes. This argument, however, ignores a fairly obvious detail—the signature "Gary Anderson" appears above the signature line at the bottom of the application form. (Def.'s Mot. for J. Ex 4, pg. 2.) Immediately below the signature line appears the designation for "*Spouse's* Signature." (*Id.* (emphasis added)).

Plaintiff neither contends nor points to any evidence that Gary's signature is not genuine.[7] The application itself contains no indication that Gary's signature is not genuine.

In his Motion for Judgment, Plaintiff submits an Affidavit by forensic document examiner, Robert N. Morris, stating his expert opinion that:

> [N]o meaningful examination and comparison can be conducted of the handwritten marks on the Application . . . and that no certified Forensic Document Examiner could determine if the person who wrote the name 'Gary Anderson' on the line above the words 'Spouse's Signature' is the same person who wrote the handwritten "x" marks in the information blocks in the column under 'Spouse' on the Application . . . .

(Pl.'s Mot. for J. Ex. 2, pg. 2.) Determination as to who made the "x" marks, however, is not dispositive. By signing his name at the bottom of the application, Gary effectively adopted or ratified all information provided in the application. On the same page appeared the language: "To the best of my knowledge and belief all written, telephonic, and electronic info I gave is true and complete." (Def.'s Mot. for J. Ex. 4, pg. 2.) Under Virginia law,[8] as a general rule, an applicant for insurance, by his act of signing an application, is charged with notice of the statements contained therein. *Gilley v. Union Life Ins. Co.*, 194 Va. 966, 972 (1953) (citing *Flannagan v. Northwestern Mutual Life Insurance Co.*, 152 Va. 38,  47–48 (1929); *Royal Insurance Co. v. Poole*, 148 Va. 363, 377 (1927)). Regardless of who marked the boxes,

---

[7] Indeed, at oral argument, Plaintiff's counsel conceded that Plaintiff did not contest the validity of Gary's signature.

[8] The Fourth Circuit has found that "the contours of the recessionary remedy" under ERISA "is one of federal common law." *Grigg v. Nemours & Co.*, 385 F.3d 440, 447 n.4 (4th Cir 2004) (citing *McGill Corp. v. Stinnett*, 154 F.3d 168, 171 (4th Cir. 1998)). It has also found that when fashioning federal common law, courts "'may look to state law for guidance to the extent that state law does not conflict with ERISA or its underlying policies.'" *Id.* (quoting *Shipley v. Arkansas Blue Cross & Blue Shield*, 333 F.3d 898, 902 (8th Cir. 2003); *Singer v. Black & Decker Corp.*, 964 F.2d 1449, 1452 (4th Cir. 1992)). It is appropriate, therefore, to look to state law to assist in determining whether Gary made misrepresentations.

15

therefore, Gary adopted the representations as his own by signing the application. Accordingly, it is clear that LINA did not abuse its discretion in finding that Gary made misrepresentations in the application.

At oral argument, Plaintiff's counsel maintained that, although Gary may have signed the second page of the application, LINA has adduced no evidence that he ever saw the first page on which the relevant misrepresentations appear. He argues that no evidence links the two pages of the application. Accordingly, he posits, LINA can adduce no evidence that Gary was actually aware of what he was signing. This argument is specious at best. Even a cursory examination of the two-page application form shows that the pages constitute a single document. At the top of the first page appear the following instructions: "Read the Agreements and Authorizations. Sign and date the form in the space provided." (Def.'s Mot. for Sum. J. Ex. 4, pg. 1.) At the bottom of the first page again appears the following: "You must also sign and date the Agreements and Authorization section." (*Id.*) The second page, in turn, is headed "AGREEMENT AND AUTHORIZATION," and signature lines appear at the bottom. (*Id.*, pg. 2.) Moreover, this section on the second page makes abundantly clear that, by signing, the applicant affirms the truth of the information on the first page. (*Id.*) As Plaintiff's counsel conceded at oral argument, it was entirely reasonable for the plan administrator to view the application as a single document. Applying the deferential abuse of discretion standard, the plan administrator's determination that Gary made the misrepresentations appearing on the first page of the application was objectively reasonable and supported by substantial evidence.[9]

---

[9] Although neither party ever raised the point throughout the course of this litigation, I note in passing that whether Gary himself actually made or adopted the misrepresentations on the first page of the application seems ultimately irrelevant to LINA's right to rescind. Even if I were to assume, as Plaintiff urges, that Rachel filled out the answers on the first page of the application, that she, as the employee, was the real party to the contract, and that Gary was essentially a third-

B.  <u>Whether LINA's Rescission of Coverage Was Proper</u>

The Fourth Circuit has recently joined those circuits holding that, under ERISA, an insurer may bring an equitable action to rescind coverage when fraudulently induced into issuing a policy.  *Provident Life & Accident Ins. Co. v. Cohen*, 423 F.3d 413, 422–23 (4th Cir. 2005) (citations omitted) ("Courts have long held that an insurer who was fraudulently induced into issuing a policy of insurance may bring an action in equity for rescission of the policy."); *Griggs v. E.I. Dupont De Nemours & Co.*, 385 F.3d 440, 445–46 (4th Cir. 2004).  The Fourth Circuit has clearly recognized that, under ERISA, an insurer may avoid a policy issued as a result of an applicant's material misrepresentations.

It remains unclear in the Fourth Circuit whether the elements for rescission under ERISA are governed by the federal common law or state law.  *See Provident Life & Accident Ins. Co. v. Sharpless*, 364 F.3d 634 641 (5th Cir. 2004) (finding that federal common law governs); *Shipley v. Arkansas Blue Cross and Blue Shield*, 333 F.3d 898, 902–03 (8th Cir. 2003) (rejecting application of state law and holding that federal common law requires proof of a material misrepresentation); *Beard v. TMG Life Ins. Co.*, No. 91-1808, 1992 U.S. App. LEXIS 15561 at *2 (4th Cir. July 6, 1992) (stating that "Virginia law controls on the question of whether TMG's rescission was proper"); *Peterson v. First Health Life & Health Ins. Co.*, No. 2:09cv00029, 2010 U.S. Dist. LEXIS 68382 at *18 (D.S.C. July 9, 2010) (finding that the "[d]efendant's right of rescission is subject to limitations imposed by South Carolina law").  In *Griggs v. E.I. Dupont*

---

party beneficiary, the elements required for rescission would still be met on the facts of this case. The plan administrator could have reasonably concluded that Rachel knew or should have known that the answers on the application were false.  I can find no authority for the rule that rescission requires that the party actually receiving benefits under the contract make knowing misrepresentation of material fact.  Rachel's knowing misrepresentation of Gary's health history would likewise constitute a basis for rescission of the coverage extended to Gary on the basis of those misrepresentations.

17

*De Nemours & Company*, however, the Fourth Circuit recognized: "Because no statutory provision addresses the contours of the recessionary remedy that we have concluded is proper under section 502(a)(3), the question is one of federal common law." *Griggs*, 385 F.3d at 447 (citing *Stinnett*, 154 F.3d at 171). Nevertheless, the *Griggs* court also recognized: "When fashioning federal common law, 'we may look to state law for guidance to the extent that state law does not conflict with ERISA or its underlying policies.'" *Id.* n.4 (quoting *Shipley*, 333 F.3d at 902). Therefore, in the Fourth Circuit, it seems that the elements for rescission are controlled by the federal common law, which is, in turn, informed by state law. Accordingly, the Court need not rely exclusively on authority from either source. Moreover, because the federal common law and Virginia law are largely identical as to the law of rescission, reliance on one or the other is hardly outcome determinative.

Under the federal common law, as applied by other circuits, equitable rescission is available when an applicant knowingly makes a misrepresentation as to a material matter in an application for insurance. *Shipley*, 902–03 (citations omitted). Likewise, Virginia law requires clear proof that the applicant's "answers in his application were material to the risk when assumed and were untrue." *Mutual of Omaha Ins. Co. v. Dingus*, 219 Va. 706, 713 (1979) (citing Virginia Code § 38.1-336). Moreover, where a policy contains a recitation that the applicant's answers are correct to the best of his knowledge—as in the present case—the insurer must also show that his answers are knowingly false. *Old Republic Life Ins. Co. v. Bales*, 213 Va. 771, 772–73 (1973). Under the federal common law, as under Virginia law, therefore, rescission requires proof of three elements: (1) a misrepresentation of fact; (2) as to a material matter; (3) and knowledge of the true facts. As set forth in the preceding section, Gary clearly made factual misrepresentations in his application for insurance. The first element, therefore, is

18

satisfied. The remaining issues are whether his misrepresentations were material and whether they were knowingly made.

"In cases governed by ERISA, misstatements or omissions have been deemed material where knowledge of the true facts would have influenced the insurer's decision to accept the risk or its assessment of the premium amount." *Shipley*, 333 F.3d at 905. Similarly, under Virginia law, "[a] fact is material to the risk to be assumed by an insurance company if the fact would reasonably influence the company's decision whether or not to issue a policy." *Dingus*, 219 Va. at 713; *see also Time Ins. Co. v. Bishop*, 245 Va. 48, 52 (1993) (citing *Mutual of Omaha Ins. Co. v. Echols*, 207 Va. 949, 953–54 (1967)) ("And [the] plaintiff's representation would be material to the risk if it would reasonably influence the insurance company in deciding whether to issue the policy."). Neither Plaintiff nor LINA has submitted any evidence regarding LINA's actual underwriting guidelines and whether they would favor Gary's application for coverage had he answered truthfully. Nevertheless, in its letter informing Plaintiff that the benefits were not payable, LINA did state:

> Our medical underwriting department relied upon Mr. Anderson
> being completely honest and accurate regarding his medical history
> and treatments. If accurate information had been provided to us at
> the time of his application, he would not have been approved for a
> benefit amount in excess of his guaranteed issued amount of
> $50,000. As such, the amount of coverage in excess of $50,000 is
> not payable.

(Def.'s Mot. for J. Ex. 22, pg. 136.) Moreover, in its Response to Plaintiff's Motion for Judgment, LINA also submits an "Interoffice Memo" from LINA's underwriting department to the claims adjuster, stating that had Gary responded to the questions truthfully, "our medical underwriting guidelines would have led the underwriting to decline his request for coverage." (Def.'s Resp. to Pl.'s Mot. for J. Ex. 8.) The memorandum, however, is largely devoid of details

as to LINA's underwriting requirements. The plan document itself also provides little detail. It provides, in relevant part: "An Employee or his or her eligible Spouse may become insured for an amount in excess of the Guaranteed Issue Amount only if he or she satisfied the Insurability requirement." (*Id.* Ex 1, pg. 375.) The Plan, in turn defines the "Insurability Requirement" simply as "evidence of good health." (*Id.* Ex. 1, pg. 390.) The provisions, therefore, provide little guidance for determining how Gary's truthful answers would have affected LINA's decision.

Nevertheless, LINA only need show that it did not abuse its discretion as plan administrator in determining the materiality of Gary's misrepresentations. The internal memorandum from LINA's underwriting department is sufficient to satisfy this deferential standard because it constitutes substantial evidence supporting a finding of materiality. Indeed, the Supreme Court of Virginia has held that, where the underwriter's testimony as to the materiality of an applicant's misrepresentations is uncontradicted, the misrepresentation is material as a matter of law. *Time Ins. Co. v. Bishop,* 245 Va. 48, 52 (1993). Plaintiff has adduced no evidence that LINA's determination is inconsistent with its established underwriting requirements. Moreover, under the abuse of discretion standard, the Court must also defer to the plan administrator's reasonable interpretation of plan provisions. *Nobel v. Vitro Corp.*, 885 F.2d 1180, 1188 (4th Cir. 1989). In the absence of evidence that LINA's determination as to materiality is inconsistent with its underwriting requirements, I will defer to its reasonable interpretation of the "Insurability Requirement." Accordingly, the memorandum submitted by LINA is sufficient to show that its decision was objectively reasonable. Therefore, the materiality element for rescission is satisfied.

It seems fairly clear that Gary's misrepresentations were made knowingly. Under Virginia law, rescission of an insurance contract does not require proof of intent to deceive. *Old Republic Life Ins. v. Bales*, 213 Va. 771, 773 (1973). Rather, the insurer must show that the applicant was aware or should have been aware of the fact in question based on the circumstances. *See Bishop*, 245 Va. at 493; *Bales*, 213 Va. at 773–75. In this case, it seems fairly obvious that Gary was aware of the true condition of his health. The various medical records submitted by LINA show that Gary's physicians made him aware of his various health problems. (Def.'s Mot. for J. Ex. 15, 20 & 21.) In fact, the records suggest that Gary reported much of his own medical history to his treating physicians. (*Id.* Ex 15 & 21.) As a matter of common sense, he certainly would have been aware of the fact that he was taking Ativan for anxiety. (*Id.* Ex. 21.) The notes from Gary's visit at Southern Medical Associations show that he reported the positive effects of the Ativan on his condition. (*Id.*) Gary also certainly would have been aware of the battery of tests that he personally underwent on February 26, March 19, March 20, March 27, and June 6, 2008. (*Id.* Ex. 15, 16, 17, 18 & 19.) In sum, LINA did not abuse its discretion in determining that Gary knowingly misrepresented his health and medical history. The medical records surely constitute substantial evidence supporting that conclusion. Accordingly, LINA's determination that the requirements for equitable rescission were met was objectively reasonable based on the facts and evidence before it.

At oral argument, Plaintiff's counsel renewed the argument asserted in the Complaint and on appeal during the administrative review process that LINA breached the terms of the policy by failing to determine whether the benefits were payable within ninety days from filing of his claim. This argument is unpersuasive. The Amendatory Rider to the plan document contains "CLAIM PROCEDURES APPLICABLE TO PLANS SUBJECT TO THE EMPLOYEE

RETIREMENT INCOME SECURITY ACT ('ERISA')." (*Id.* Ex. 1, pg. 392.) It provides: "The provisions below amend the Policy to which they are attached. They apply to *all claims for benefits* under the Policy. They supplement other provisions of the Policy relating to claims for benefits." (*Id.*) (emphasis added.) Under the section headed "Review of Claims for Benefits," the rider states: "The Insurance Company [LINA] has 45 days from the date it receives a claim for disability benefits, or 90 days from the date it receives a claim for any other benefit, to determine whether or not benefits are payable in accordance with the terms of the Policy." (*Id.*) Therefore, the policy provides that LINA must make its final determination as to payment of benefits within ninety days of the claim. The issue becomes whether this ninety-day window precludes LINA from seeking rescission of the coverage more than ninety days after Plaintiff filed his claim for benefits. Because the ninety-day window governs only the administrative review process required for exhaustion of a claimant's administrative remedies, it does not preclude LINA from rescinding coverage.

The ninety-day window provision contained in the Amendatory Rider closely tracks the ERISA regulations in 29 C.F.R. § 2560.503-1 (2012). These regulations contain certain procedural requirements that plan administrators must follow in reviewing claims for benefits. Such requirements are crucial to determining whether claimants have properly exhausted their administrative remedies before filing civil actions under ERISA. *See Linder v. BYK-Chemie USA, Inc.*, 313 F. Supp. 2d 88, 91 (D. Conn. 2004). The relevant regulations provide: "Every employee benefit plan shall establish and maintain reasonable procedures governing the filing of benefit claims, notification of benefit determinations, and appeal of adverse benefit determinations . . . ." 29 C.F.R. § 2560.503-1(b) (2012). The section governing the timing of notification of benefit determinations provides:

> [I]f a claim is wholly or partially denied, the plan administrator shall notify the claimant, in accordance with paragraph (g) of this section, of the plan's adverse benefit determination within a reasonable period of time, but not later than 90 days after receipt of the claim by the plan, unless the plan administrator determines that special circumstances require an extension of time for processing the claim. If the plan administrator determines that an extension of time for processing is required, written notice of the extension shall be furnished to the claimant prior to the termination of the initial 90-day period. In no event shall such extension exceed a period of 90 days from the end of such initial period.

*Id.* § 2560.503-1(f). The language included the Amendatory Rider closely follows this language and was clearly intended to incorporate the regulations. LINA presumably included this similar language because, under the regulations, claims procedures for a plan are deemed reasonable only where "[a] description of all claims procedures . . . and the applicable time frames is included as part of a summary plan description." *Id.* § 2560.503-1(f). It is clear, therefore, that the language in the Amendatory Rider is intended to govern only the process for reviewing claims at the administrative level, not relief available at law or equity. The ninety-day window provision merely sets forth a time frame within which the administrative process must occur. It is not intended to function as an incontestability clause that would bar the insurer from challenging the validity of the coverage in a subsequent civil action. This interpretation has particular force in light of the fact that the plan document contains a separate incontestability provision in the "GENERAL PROVISIONS" section. (Def.'s Mot. for J. Ex. 1, pg. 388.) This provision states: "After two years from an Insured's effective date of insurance, or from the effective date of any added or increased benefits, no ['statement made by the Employer or an Insured'] will cause insurance to be contested except for fraud or eligibility for coverage." (*Id.*) Construing the plan document as a whole, therefore, it becomes clear that the ninety-day window provision is only intended to provide a time line for the administrative process.

The full text of the regulations tracked by the Amendatory Rider language provides further support for this interpretation. The applicable regulations go on to provide:

> In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

*Id.* § 2560.503-1(l). The consequence of a plan administrator's failure to abide by the claim procedures, therefore, is that the claimant's administrative remedies are deemed automatically exhausted and he may pursue his available civil remedies in court. *Id.* Such failure does not preclude the plan fiduciary from pursuing other remedies available independent of the claim review process. Again, the purpose of these provisions is to provide a time line for a claimant to exhaust his administrative remedies. Therefore, LINA could rescind the coverage regardless of the passage of the ninety-day window.

At oral argument, counsel for both parties also touched briefly on whether LINA acted properly in reclaiming the proceeds that it had set aside to satisfy Plaintiff's claim. Both parties display some confusion about what benefit proceeds were placed into Plaintiff's CIGNAAssurance® account at what time. LINA's counsel seems to assume that LINA placed the relevant proceeds into Plaintiff's CIGNAAssurance® account. Plaintiff's counsel seems to acknowledge, however, that LINA merely held the funds in reserve in its own internal accounts to ensure sufficient funds to pay Plaintiff's claim and never actually deposited them into

Plaintiff's CIGNAAssurance® account.  The chronology of events becomes crucial to resolving this issue.[10]

On August 17, 2009, McCormick, as Plaintiff's guardian, submitted a claim form for the benefits under Gary's coverage on behalf of Plaintiff.  (*Id.* Ex. 8.)  The claim form provided the following:

> If your insurance benefit is $5,000 or more, CIGNA will automatically open a free, interest-bearing account in your name. This account, called the CIGNAAssurance® Program, is a safe, secure place to keep your proceeds while you decide how best to use them. . . . You can take all or part of the money out of the account simply by writing a draft. . . . This account is not insured by the Federal Deposit Insurance Corporation or any federal agency.  Account balances are the liability of the insurance company and the insurance company reserves the right to reduce account balances for any payment made in error.

(*Id.*)  Because Plaintiff was a minor at the time of Gary's death, LINA sent a letter dated August 24, 2009, to McCormick, stating that the benefit proceeds would remain on deposit with LINA until he reached his age of majority, at which time it would send Plaintiff a claim form.  (Def.'s Mot. for J. Ex. 7, pg. 81.)  Subsequently, on August 31, 2009, Garrett retained counsel to appeal LINA's decision denying Rachel's heirs the proceeds of Gary's coverage under Virginia's slayer statute.  (*Id.* Ex. 9, pg. 262 & Ex. 10, pg. 262.)  While Garrett's appeal was pending, Plaintiff reached the age of majority.  (*See id.* Ex. 11.)  By letter dated March 24, 2010, LINA apologized to Plaintiff for the delay in releasing the proceeds under the policy and informed him that review of an appeal by a contesting party was ongoing.  (*Id.*)  LINA denied Garrett's appeal on May 5, 2010.  (*Id.* Ex. 12, pg. 206–09.)  On the following day, May 6, 2010, LINA sent Plaintiff a letter

---

[10]  Resolution of this issue is crucial because, if LINA had placed the funds in Plaintiff's CIGNAAssurance® account, both parties would have fully performed the insurance contract, and the question of rescission would be a vastly different one.  Having transferred the funds to Plaintiff, LINA arguably would not be free to rescind and resort to self-help by reasserting control of those funds.

stating: "I have approved your claim for Group Term Life Insurance for $25,629.35." (*Id.* Ex. 13, pg. 193.) The letter further stated: "Mr. Anderson, we know you have a lot on your mind and may wish to wait for a while before making any major financial decisions. That's why we've deposited your insurance proceeds into a CIGNAAssurance® account in your name. The account is free, and earns an attractive rate of interest comparable to a money market checking account. You may keep your money in this account for as long as you like." (*Id.*) On the same day, LINA sent a letter to Plaintiff's counsel informing him "that the remaining benefit under the Dependent Group Term Life insurance claim for Gary V. Anderson is still being reviewed." (*Id.* Ex. 14.) It further explained: "Mr. Anderson had elected a benefit level which was in excess of the guaranteed issue amount. The additional coverage was provided based on his answers to the evidence of insurability questionnaire. . . . [A]n evidence of insurability investigation must be performed to establish the accuracy of the information he provided in the questionnaire." (*Id.*)

It is clear based on the chronology and content of these communications that LINA's May 6, 2010, letter to Plaintiff, informing him that his claim is approved, and its May 6, 2010, letter to Plaintiff's counsel, informing him of the investigation into Gary's answers, refer to proceeds from different coverage. At the time of his death, Gary had a voluntary, guaranteed issue in the amount of $50,000.00, and a voluntary, non-guaranteed issue in the amount of $50,000.00. (*Id.* Ex.1 & 2.) LINA's May 6, 2010, letter to Plaintiff, informing him that his claim was approved and that $25,629.35 was in his CIGNAAssurance® account, clearly refers to the proceeds of the $50,000.00 voluntary, guaranteed issue. That amount is not in dispute here. LINA's May 6, 2010, letter to Plaintiff's counsel, on the other hand, clearly refers to the additional $50,000.00 non-guaranteed issue that Gary requested when he filled out the application. By letter dated July 20, 2010, LINA informed Plaintiff's counsel that the benefits

under this issue were not payable as a result of Gary's misrepresentations in his application. (*Id.* Ex. 22.) Accordingly, it appears that LINA never placed the benefits at issue into Plaintiff's account. Counsel, however, proceed as if it did so and subsequently removed the funds.

LINA argues that the provision regarding the CIGNAAssurance® account contained in the claim form submitted by McCormick on behalf of Plaintiff allowed it to reduce the balance of his account to correct payment errors. (Def.'s Mot for J. pg. 10; Def.'s Resp. to Pl.'s Mot. for J. pg. 11–12.) Plaintiff counters that this provision's the language indicates that it is intended to give LINA authority to correct payments made in error by Plaintiff through draft writing. (Pl.'s Mot. for J. pg. 6.) Both Plaintiff and LINA, however, seem to ignore the evident fact that LINA never actually deposited the proceeds of the voluntary, non-guaranteed coverage in Plaintiff's CIGNAAssurance® account. LINA placed only the $25,629.35 in proceeds from the guaranteed coverage as stated in its May 6, 2010, letter to Plaintiff. (*Id.* Ex. 13.) This amount is not at issue. Neither party has adduced any evidence that LINA deposited or otherwise transferred to Plaintiff's control any benefits under the non-guaranteed coverage at issue. Therefore, the claim form provision cited by both parties is simply irrelevant. Because LINA did not deposit the relevant proceeds in Plaintiff's account, it could not have wrongfully reduced or removed those proceeds. Because LINA had the right to rescind the coverage, it follows that it had the right to refrain from paying out benefits under that coverage. During oral argument, Plaintiff's counsel suggested that LINA acted improperly by reclaiming funds that it had set aside in its own internal accounts to satisfy Plaintiff's claim. Plaintiff's counsel, however, cites no authority, and I can find none, standing for such a rule. Common sense dictates that LINA, never having transferred any funds to Plaintiff's CIGNAAssurance® account, was free to exercise its right of

rescission by not paying out those funds. LINA in no way acted improperly by retaining the funds in this manner.

## IV.    CONCLUSION

As discussed above, LINA clearly did not abuse its discretion in determining that Gary misrepresented his health and medical condition in his application. Such a determination was objectively reasonable and based on substantial evidence. Furthermore, LINA acted properly in rescinding Gary's coverage and refusing to pay the proceeds to Plaintiff. For the reasons set forth above, Defendant's Motion for Judgment is **GRANTED**, and Plaintiff's Motion for Judgment is **DENIED**.

The clerk is directed to send a copy of the Memorandum Opinion and accompanying Order to counsel of record.

Entered this 30th day of March, 2012.

s/Jackson L. Kiser
SENIOR UNITED STATES DISTRICT JUDGE